CALMAR STEAMSHIP CORPORATION, a corporation; Globe and Rutgers Fire Insurance Company, a corporation; American Home Assurance Company, a corporation; The Netherlands Insurance Company Est. 1845, a corporation; New Hampshire Fire Insurance Company, a corporation; and Birmingham Fire Insurance Company of Pennsylvania, a corporation, Libelants,

v.

W. J. JONES & SON, Inc., a corporation, Respondent,

PITTSTON STEVEDORING CORPORATION, Third-Party Respondent.

Civ. No. 8464.

United States District Court
D. Oregon.

June 13, 1958.

Erskine B. Wood, Wood, Matthiessen, Wood & Tatum, Portland, Or., for libelants.

Dennis J. Lindsay, Krause, Lindsay & Kennedy, Portland, Or., for respondent W. J. Jones & Son, Inc.

Wayne Hilliard, Koerner, Young, McColloch & Dezendorf, Portland, Or., for third-party respondent Pittston Stevedoring Corp.

EAST, District Judge.

It is apparent from the evidence and agreed facts that:

Libelant Calmar Steamship Corporation is a Delaware corporation (Calmar) engaged in intercoastal steamship business as a common carrier of lumber eastbound and was, at all times pertinent to this matter, the bareboat charterer and operator of the SS Alamar.

Libelants Globe and Rutgers Fire Insurance Company; American Home Assurance Company; The Netherlands Insurance Company Est. 1845; New Hampshire Fire Insurance Company; and Birmingham Fire Insurance Company of Pennsylvania; are each insurance companies duly organized and existing under the laws of their respective States of incorporation and were P & I underwriters of the vessel Alamar during the year 1954, each of said underwriters bearing a 20% interest in the insurance. This underwriting was subject to the usual P & I conditions, with a $1,000 deductible in respect to claims for personal injuries;

Respondent W. J. Jones & Son, Inc. is an Oregon corporation (Jones) engaged in the stevedoring business within the State of Oregon;

Third-party respondent Pittston Stevedoring Corporation is a New York corporation (Pittston) engaged in the stevedoring business in the New York Harbor, and was interpleaded under the 56th Admiralty Rule by Jones;

Pursuant to the terms and provisions of a written contract with Calmar (libelants' exhibit 35), Jones, as stevedore, loaded a cargo of lumber aboard the vessel Alamar at Newport, Oregon, from approximately June 2, 1954, to and including June 6, 1954;

Said written contract between Calmar and Jones contained or provided, inter alia:

"The Above Rates Will Include the Following Services of the Contractor:

"a. The supplying of all necessary stevedoring labor, including winchmen, hatch tenders, and foremen, and all stevedoring direction and supervision requisite or necessary for the proper and efficient conduct and control of the work, as well as any equipment and labor needed in switching cars, etc."

The vessel Alamar completed her voyage to New York Harbor via the Panama Canal and Pittston, as stevedore, unloaded said cargo of lumber from the vessel at the India Street Dock, Brooklyn, New York, all pursuant to a written stevedoring contract with Calmar (libelants' exhibit 36), which contract contained, inter alia, an identical provision as aforesaid in the Jones contract;

During the course of the unloading of the vessel and the discharge of its cargo at Brooklyn as aforesaid, Edward Oprosko, a longshoreman employed by Pittston, was injured by the falling or collapsing of a tier in one of the wings of the No. 2 lower hold. Thereafter, the said Oprosko filed an action against Calmar in the United States District Court for the Eastern District of New York to recover $350,000 damages on account of his in-

juries aforesaid (summons and complaint in said action libelants' exhibit 52).

On October 8, 1954, Calmar gave notice to Jones to defend the said suit brought by Oprosko against Calmar; Jones acknowledged receipt of said notice and forwarded it to Jones' insurance underwriter, The National Automobile and Casualty Company of Los Angeles; however, neither Jones nor said underwriter took any action whatsoever in response to said notice, and on December 15, 1954, Calmar gave due notice to Jones and said underwriter of Oprosko's last settlement offer. However, neither Jones nor the underwriter took any action in response thereto.

On February 8, 1955, Calmar made an out-of-Court settlement with Oprosko for the sum of $117,500, in full settlement and release of all claims of Oprosko arising out of the incident of his injuries aforesaid.

In addition to the amount paid Oprosko in said settlement, Calmar incurred reasonable attorney's fees and expenses in the sum of $3,465.76, all in connection with the defense and settlement of Oprosko's claims and suit aforesaid; that on or about March 9, 1955, Calmar was reimbursed by its P & I underwriters the amounts of said settlement and attorney's fees and expenses, less the sum of $1,000 deductible.

In this action Calmar claims that Jones breached and negligently performed its contractual obligations in loading the vessel in that Jones failed to load and stow the wing tiers in No. 2 lower hold in a secure, proper and safe manner, and failed to place sufficient or any binders or stickers or laths or cross pieces in the wing tiers of lumber on the starboard side in No. 2 lower hold, and in that Jones stowed some of the boards loosely and on edge, i. e., with the boards resting on the narrow 2-inch dimension instead of the broad dimension, in the wing tiers on the starboard side of No. 2 lower hold, with the result that the

wing tiers of lumber were stowed insecurely and loosely, thereby creating a hazard that they might topple over or collapse or fall down. Wherefore, libelants claim they are entitled to recover the sum of $120,965.76, together with legal interest thereon from February 8, 1955, until paid, from Jones by way of indemnity and damages for the breach of its stevedoring contract aforesaid.

Jones denies all of the claims and contentions of Calmar and Pittston and claims that:

If the wing tiers were insecure, loose and likely to topple or fall, said condition was due wholly or in part to heavy weather encountered by the vessel in its voyage to New York and to Calmar's negligence in permitting a heavy list to port while harboring in Brooklyn, New York.

It was immediately and readily apparent on commencing to unload the wing tiers of lumber in the No. 2 lower hold of the SS Alamar at the India Street Dock in Brooklyn on July 6, 1954, that these tiers were in a shaky and unsafe and dangerous condition and likely to topple over and injure longshoremen employed by Pittston who were working there. Calmar was apprised and had full knowledge of this open and notorious and unsafe condition, but that nevertheless Calmar directed the discharging longshoremen to proceed with their work instead of remedying this condition by means readily available, which were immediately resorted to after the accident to Oprosko, namely, by pulling down the shaky tiers with a cargo hook.

The injuries to Oprosko and any liability of Calmar to Oprosko were due to the sole negligence of Calmar or the joint and concurring negligence of Calmar and Pittston in failing to keep the SS Alamar seaworthy where the unsafe conditions were open and notorious and known to Calmar and to Pittston and where these unsafe conditions were allowed to continue and the discharging longshoremen were directed to work in disregard thereof.

Jones further claims and contends against Pittston that:

During the discharging from the No. 2 lower hold of the SS Alamar at Brooklyn, Pittston improperly and negligently worked down into the flooring before attempting to remove the lumber in the wing tiers which resulted in the wing tiers having no firm foundation on which to rest and thus made them subject to being toppled under the conditions then and there existing.

It was immediately and readily apparent to Pittston before commencing to unload the wing tiers to the No. 2 lower hatch of the SS Alamar that these tiers were in a shaky and unsafe condition and likely to fall and injure the discharging longshoremen. Nonetheless, Pittston negligently allowed and directed its employees, including Oprosko, to work under these conditions instead of remedying the situation by means readily at hand, as was done subsequent to the accident to Oprosko.

Pittston denies the contentions of Calmar and Jones and claims and contends in effect that the injuries to Oprosko were proximately caused by the negligence of Jones, as contended by Calmar against Jones and as contended and claimed by Jones against Calmar.

The law of this matter is delineated by Ryan-Stevedoring Co. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, and American President Lines v. Marine Terminals Corp., 9 Cir., 1956, 234 F.2d 753. And the chore of the Court is that of finding and resolving the true factual situation as presented by the conflicting evidence under the contentions of the parties respectively.

■ At the outset the Court finds from the evidence that the settlement made by Calmar with Oprosko is a fair and reasonable settlement of the New York District Court action. Further, that the attorney's fees and expenses incurred were necessary and were reasonable. The Court will accept Jones' and Pittston's contentions that Calmar acknowledged by its settlement with Oprosko that the vessel Alamar with its married cargo was unseaworthy at the time the said cargo was being discharged and Oprosko was injured. The query is whose conduct, Calmar, Jones, or Pittston, or any two or more of them, was the sole, active and primary cause of such unseaworthiness and Oprosko's resulting injuries. For the main part the witnesses in this case consist of the members of the longshoring gangs which loaded the vessel at Newport, Oregon, who appeared in person and gave testimony at the trial, and the members of the longshoring gang in New York, of which Oprosko was a member at the time of Oprosko's injuries. The Court had the benefit of observing the demeanor of the West Coast longshoremen while they were on the witness stand at the trial. However, the Court must rely on the written deposition of testimony of the East Coast longshoremen without the benefit of seeing them in open court. The substance of the testimony between the Western and Eastern longshoremen is at direct variance and in sharp conflict.

A few examples:

West Coast

1. The wing tiers were usually 6 feet in height.

2. Although the gangs could not recall the loading of a Calmar vessel similar to the ALAMAR on this particular voyage, they claimed they *always* used lath or other material as stickers in the wing tiers.

East Coast

1. The wing tiers on the voyage in question were 9 feet in height.

2. There were no stickers in the said wing tiers.

West Coast

3. Respondent's Exhibit 71a being a photograph of a Calmar vessel's No. 2 lower hold stowed with lumber products up to the level of the working floor (this picture was taken during the course of the loading of a cargo of lumber on a Calmar vessel at some subsequent date to the voyage in question). The photograph reveals a 6 to 8 inch space between the top of the archway in said hold and the working floor level. Respondent's Exhibit 71d is a photograph showing that the clearance between the working floor and the bottom of the hatch coaming of the 'tween deck is approximately 3 feet. This Exhibit also shows the customary *crayon or chalk markings of lot numbers* on the working floor. Respondent's Exhibits 71c and 71e are photographs showing the cramped position of the longshoremen attempting to work the cargo through 3 feet of clearance between the working deck and the mentioned hatch coaming. Exhibit 71k being a photo which also shows the cramped position of longshoremen attempting to complete 6 foot tiers with a 3 foot clearance between the working deck and the mentioned hatch coaming. Respondent's Exhibits 71f and 71L are photographs showing 6 feet, more or less, head space and height of tiers in the wings between the beams of the 'tween deck and the level of the working deck as shown in respondent's Exhibit 71a. The respondent claims that the ALAMAR on the voyage in question was stowed with lumber in like fashion.

East Coast

3. Members of the neighbor gang came through the arch in the No. 2 lower hold to aid Oprosko at the time he was injured.

At this point we recall Jones' contention that, in the course of discharging the lumber, the East Coast longshoremen cut into the working floor within the square of the hatch approximately three feet, and then began discharging the

tiers in the wings. It thus appeared that these tiers were nine feet in height, when in fact the apparent tier was a six foot wing tier with a three foot working-floor base. Bearing in mind the discharge of lumber cargo is in inverse order to the stowage of lumber in lot numbers, to cut into the working floor in disregard of the crayon or chalk lot numbers would be a breaking of lots and an unusual stevedoring practice. Jones contends that the Alamar encountered heavy weather and seas on her voyage and that the wing tiers were rendered shaky and loose by the roughness of the voyage and that such was not due to improper stowage. In answer to this it must be noted that the record is absolutely devoid of the disruption of the stowage of any cargo in any other hold or part of the vessel by reason of heavy seas during the course of the voyage in question.

The evidence reveals that the walking boss of the East Coast gang had noticed a slight list to the port and called to the Alamar's mate's attention that it appeared to be bum stowage and that the tiers were topply and shaky, to which the mate replied, in effect, "Do the best you can." The walking boss and East Coast longshoremen testified that they attempted to take precautions and steady the shaky tiers by placing wedges between the beams of the 'tween deck and the top of the tiers. At this point it is interesting to note that the East Coast longshoremen referred to a tier "as a one-board width," whereas the West Coast longshoremen referred to a tier "as being approximately a 2-foot width," and that they discharged the stowage of lumber in the wings by attempting to remove one-board width at a time. The evidence is clear that after Oprosko was injured by a falling tier or tiers of the lumber, the remainder of the tiers were pulled down by the use of lumber hooks. Jones urges that this procedure of pulling down should have been utilized in the first instance. This Court feels that this position is purely a matter of hindsight and it cannot say that the East Coast longshoremen were reckless or improper

in their judgment when they adopted the procedure of wedging. There is no evidence that this procedure was not a valid exercise of judgment in the performance of Pittston's contract. It is further to be noted that the record is devoid of any evidence to the effect that the East Coast longshoremen did not follow good practice in dealing with the shaky and wobbly tiers as they found them. The Court concludes that the procedure of attempting to wedge the wobbly stacks was not a reckless exercise of judgment in the matter.

While not of substantive evidence, certain written statements made by various members of the West Coast longshoremen gang during the course of investigation by proctors for Calmar, but later repudiated by the respective witnesses on the witness stand, are of some aid in the matter. There appears to be a majority view of the East Coast longshoremen that the lumber cargo in the wing tiers was 2 x 8 planks.

West Coast witness E. H. Simmons, in his signed written statement adopted, inter alia, this language:

"On 2 x 6—put in stickers if tier gets wobbly. Same on 2 x 8's. Put in stickers if it gets wobbly. It is a question of guesswork and judgment. No set rules about stickers.

"We have stowed a few planks on edge, to straighten up a pile. But only about 3 ft. high.

"We usually leave about 5 ft. clearance under the hatch coaming in #2 hatch."

West Coast witness W. J. Penn, by his signature subscribed to a written statement containing, inter alia:

"On some Calmar ships there is a very deep hatch coaming, which comes down about 2' below the 'tween deck beams. There have been some occasions when we would get an order from the walking boss to leave full headroom—about 6'—under the coaming. When we did this we could only floor up to within 6' of the underside of the coaming,

and this would be about 8 feet below the beams in the wing. That would require winging up tiers in the wing about 8 ft. high. When we did this, we would build a tier about 6 ft. high the length of the hatch and then build a step from the next tier, and step up on the next tier and finish off the top of the original tier, when we got suitable lengths.

"This was the exception. Most of the time we have floored up to within 6 ft. of the 'tween deck beams. It was only once in a while we were ordered to leave 6 foot headroom under the coaming. Some time ago we were ordered not to wing up to 8 ft., but to always floor up so that tiers would be only 6 ft. high. I don't remember when we received that order. We never liked the practice of having to build on wing tiers from steps."

West Coast witness John W. Miller, by his signature subscribed to the following statement, which contained, inter alia:

"On 2 x 8's, there have been times when we have put up wing tiers without stickers, however, general practice to use them on 2 x 8's.

"We decide ourselves when to use stickers, I mean the holdmen doing the work decide when to use them."

To this Court this discredited and impeached showing gives a logical answer to the East Coast longshoremen's position that the tiers were approximately 9 feet in height on the voyage in question and that there was sufficient space between the working floor and the top of the arch in No. 2 lower hold to allow the neighbor longshoremen to pass through in aid of Oprosko at the time of his injury. The exception referred to by witness Penn is more logical than Jones' position that the working floor was cut into approximately 3 feet.

Jones contends that its stowage of the cargo was inspected by the officers of the Calmar and urged some theory of acceptance of the stowage. Suffice to say, the record is devoid of any evidence to that effect.

The Ryan case, supra, 350 U.S. at pages 134, 135, 76 S.Ct. at page 238, establishes, as cited In American President Lines v. Marine Terminals Corp., supra, 234 F.2d at page 759:

"Whatever may have been the respective obligations of (Jones) and of (Calmar) to the injured longshoreman for proper stowage of the cargo, it is clear that, as between themselves (Jones), as a warrantor of its own services, cannot use (Calmar's) failure (if any) to discover and correct (Jones') own breach of warranty as a defense. (Calmar's) failure (if any) to discover and correct (Jones') own breach of contract cannot here excuse that breach."

■■ This Court concludes from the evidence in this case that the unseaworthiness of the vessel Alamar was not due to the risks of the voyage, nor to the acts and conduct of the vessel's crew and officers. The query therefore resolves itself as to Jones on one hand, and Pittston on the other. The proper credibility of witnesses is most difficult to determine when there is testimony given by way of deposition. The Court has no hesitation in saying that the demeanor of some of the witnesses from the West Coast gang on the witness stand gave the impression that they were attempting to bolster. For example, it was conceded by the parties that the purpose of stickers was to bind together the boards within a tier and not to bind together one tier with another, yet one witness of the West Coast gang testified boldly that it was a practice to drive the stickers into the adjoining tier so as to bind them together, indicating clearly that he knew not whereof he spoke. One factor of aid to the Court is that none of the West Coast gang, except one, a part-time longshoreman of poor demeanor, had any independent recollection of the stowage of the lumber cargo on the voyage in question, and had to rely upon general or

usual practice. The statements of the witnesses, as mentioned, indicated that there were occasions when general or usual practice was varied. The East Coast gang, on the other hand, had very definitely in mind the cargo that was being discharged at the time Oprosko was injured. The Court acknowledges that in determining testimony at direct variance, it must look at all facets, inferences, and probabilities to determine on which side the preponderance lies. This Court cannot escape the confusion and impracticability that develops when lots are broken, and I therefore cannot find that the East Coast gang cut into the working floor which by the nature of things would divide lots. Therefore, this Court concludes that the preponderance of all of the evidence in the case indicates that the wing tiers involved were approximately 9 feet in height. Further, that Jones failed to properly build and use sufficient stickers to bind the wing tiers on the voyage in question. Therefore, this Court concludes that the shaky and wobbly condition of the wing tiers in question was due to the improper stowage of the lumber cargo by Jones, thereby causing the tiers likely to fall and consequently rendering the vessel Alamar unseaworthy, and that such improper stowage was the sole, active, and primary conduct causing the tier to topple or fall and the resulting injuries to Oprosko. This conclusion invokes the rule of Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., supra, 76 S.Ct. at page 234, and American President Lines v. Marine Terminals Corp., supra, 234 F.2d at pages 758, 759, being paraphrased as follows:

"The (Calmar) here holds (Jones') uncontroverted agreement to perform all of (Calmar's) stevedoring operations at the time and place where the cargo in question was loaded. That agreement necessarily includes (Jones') obligation not only to stow the (lumber) but to stow (it) properly and safely. Competency and safety of stowage are inescapable elements of the service undertaken. This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of (Jones') stevedoring contract. It is (Jones') warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product."

Having reached this conclusion as to the facts and the law, it follows that Calmar and its insurance underwriters libelants are entitled to full indemnity upon the settlement with Oprosko from Jones. Therefore, the Court concludes that the libelants, as insured and underwriters respectively are entitled to have and recover from Jones the settlement sum of $117,500 and the further sum of $3,465.76 attorney's fees and expenses of litigation, together with interest on each of said amounts at the rate of 6% per annum from February 8, 1955, until paid, and costs of this proceedings.

Jones' petition in interpleader and its cause against Pittston should be dismissed.

It is the conclusion of the Court that the judgment in favor of the libelants against Jones should be a joint judgment, with the view that if the libelants are unable to agree and stipulate in writing filed with this Court as to their respective proportionate share or interest in said judgment, that that question be segregated for later determination by this Court.

Proctors for libelants are requested to submit findings of fact, conclusions of law and decree in conformity with this opinion. Jones may have 20 days after service of such proposed findings, conclusions and decree within which to file objections thereto.